Sheldon Pollock
Wendy Tepperman
Hayden M. Brockett*
Nicholas Flath
Teresa A. Rodriguez
*Pro hac vice application forthcoming

U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-9107 (Brockett)
BrockettH@sec.gov
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>          **-against-**<br><br>**DONALD G. BASILE, GIBF GP, INC., and MONSOON BLOCKCHAIN CORPORATION,**<br><br>                    **Defendants.** | **COMPLAINT**<br><br>**26 Civ. 2293 (     )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff U.S. Securities and Exchange Commission ("Commission"), for its Complaint

against Donald G. Basile ("Basile"), GIBF GP, Inc. ("GIBF"), and Monsoon Blockchain

Corporation ("Monsoon") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.      From at least March 2021 through December 2021 (the "Relevant Period"), Basile

perpetrated a securities offering fraud through Monsoon and GIBF that raised approximately $16

million from hundreds of investors across the United States and internationally.

2. Using materially false and misleading statements, Basile offered and sold investors "Simple Agreements for Future Tokens" ("SAFTs") through a public offering (the "SAFT Offering"), by which investors would purportedly receive a crypto asset that Basile variously described as "Bitcoin Latinum," "BTCL," or "LTNM."

3. The SAFTs purported to give investors "the right to receive" LTNM in the future, "when and if" GIBF—an entity that Basile controlled—declared, in its sole discretion, that a "Milestone…is satisfied."

4. Basile offered and sold the SAFTs to investors as securities, and the SAFTs stated that they were "a security."

5. As part of the SAFT Offering, Basile made several types of materially false and misleading statements to investors, both directly and through GIBF and Monsoon.

6. For example, Basile repeatedly and falsely claimed that LTNM "is an insured…cryptocurrency," and "is the world's first insured digital asset," with "up to $1 billion coverage" from an international insurance broker and risk adviser ("Insurance Broker 1"). In fact, LTNM had no such insurance coverage, and no insurance company ever issued a policy or otherwise insured LTNM or any other part of the SAFT Offering.

7. In addition, Basile falsely claimed that LTNM "is an asset-backed cryptocurrency," and that an "existing trust" or "underlying trust fund" secured LTNM's value. He also disseminated the false claim that a "basket of digital assets such as Bitcoin or Ethereum are managed to support the LTNM asset pool." In truth, no such trust or asset pool was ever created, and there was no "asset-backing" of LTNM.

8. Basile further falsely claimed that, at various times, "80%" or more of the SAFT Offering proceeds would be "used to support the underlying value" of LTNM or would go "into an underlying fund." Basile also disseminated the false claim that 80% of the SAFT Offering proceeds

would "flow back into LNTM [sic] to support token development." In reality, nothing approaching 80% of SAFT Offering proceeds was spent on "token development" or a fund to "support" the value of LTNM.

9.      Instead, Basile used accounts containing investor funds for his personal benefit, including to pay approximately $4.1 million towards the purchase of a condominium in Miami, Florida; to purchase a $2.8 million house in Park City, Utah; to pay about $1.4 million on his personal American Express card; and to buy a $160,000 horse for his daughter.

10.     Ultimately, after selling SAFTs to hundreds of investors, Basile stopped promoting LTNM; LTNM is now valueless, and many investors have lost their entire investment.

**VIOLATIONS**

11.     By virtue of the foregoing conduct and as alleged further herein, GIBF and Monsoon violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

12.     By virtue of the foregoing conduct and as alleged further herein, Basile violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and aided and abetted (i) GIBF's and Monsoon's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], in violation of Securities Act Section 15(b) [15 U.S.C. § 77o(b)]; and (ii) GIBF's and Monsoon's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5], in violation of Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

13.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

3

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

14.    The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

15.    The Commission seeks a final judgment: (a) permanently enjoining GIBF, Monsoon, and Basile from violating the federal securities laws and rules that this Complaint alleges they violated; (b) restraining and enjoining GIBF, Monsoon, and Basile from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Basile from purchasing or selling securities for his own personal account; (c) ordering GIBF, Monsoon, and Basile to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering GIBF, Monsoon, and Basile to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (e) prohibiting Basile from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5)]; and (f) ordering any other and further relief this Court may deem just and proper.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

17.    GIBF, Monsoon, and Basile, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts,

practices, and courses of business alleged herein.

18.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. GIBF, Monsoon, and Basile have transacted business in the District and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District, including through the marketing and sale of SAFTs to multiple investors.

## DEFENDANTS

19.    **Basile**, age 60, was CEO of Monsoon and Chief Investment Officer ("CIO") of GIBF during the Relevant Period. Basile founded and managed GIBF and Monsoon and conceived of and managed the SAFT Offering. Basile was described during the SAFT Offering as "the founder of Bitcoin Latinum." Separately, Basile has acted (and in one instance continues to act) as a public company executive officer or director.

20.    **GIBF** is a Delaware corporation. As described further herein, GIBF was the issuer of the SAFTs. During the Relevant Period, Basile was GIBF's CIO and a GIBF director. According to a January 9, 2025 Delaware Court of Chancery default judgment, Basile is now GIBF's "sole director, Chief Executive Officer, President, Secretary, and Treasurer."

21.    **Monsoon** is a Delaware corporation. During the Relevant Period, Basile was the sole director and CEO of Monsoon, which marketed the SAFT Offering and ostensibly served as the "developer" of LTNM. According to a January 9, 2025 Delaware Court of Chancery default judgment, Basile is now the "sole director, Chief Executive Officer, President, Secretary, and Treasurer" of Monsoon.

**FACTS**

I.    **DEFENDANTS MARKETED, OFFERED, AND SOLD "SAFTS" AS SECURITIES**

22.    This Complaint concerns Basile's fraudulent offering and sale of Simple Agreements for Future Tokens, also known as SAFTs, which Basile marketed and held out to purchasers as securities.

23.    SAFTs are written agreements used to raise capital from investors, whereby an issuer agrees to deliver crypto assets that have not yet been generated to investors at a later date in exchange for their investment today.

24.    Throughout the Relevant Period, Basile characterized and marketed the SAFT Offering here as a security to numerous investors in the United States and internationally.

A.    **The SAFTs Stated that They Were Securities.**

25.    Basile caused each SAFT to list GIBF as the "issuer" of the SAFT and each purchaser as the "Investor."

26.    Other than pricing differences, the offering documents for each SAFT contained nearly identical language.

27.    The first page of the SAFT bore the following caption: "Simple Agreement for Future Tokens Issued By GIBF GP, Inc. For 'Bitcoin Latinum.'"

28.    Each SAFT typically included as "APPENDIX A" a "PURCHASE AGREEMENT for the Simple Agreement for Future Tokens" ("Purchase Agreement").

29.    By their own terms, the SAFTs were agreements between GIBF and investors, who transmitted money or crypto assets to GIBF in exchange for "the right to receive" LTNM in the future, after GIBF "in its sole discretion" declared a "Milestone" had been satisfied.

6

30.    Specifically, the SAFT defined Milestone to mean "the newly forked Bitcoin Network is operational after a successful Hard Fork with Token functionality as determined by [GIBF] in its sole discretion."

31.    The SAFT Offering documents expressly stated that the SAFT was a "security" and "security instrument" and contained language referencing the federal securities laws.

32.    For example, the offering documents for a SAFT that Basile sold to an investor who resided in Brooklyn, New York stated:

- The Investor has been advised that this SAFT is a security that has not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.

- The Investor is purchasing this security instrument for his, her or its own account for investment, not as a nominee or agent….

- The Investor is: (i) an "accredited Investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act; or (ii) not a U.S. person within the meaning of Rule 902 of Regulation S under the Securities Act.

- THIS SIMPLE AGREEMENT FOR FUTURE TOKENS ("SAFT") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS SAFT MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED WITHOUT THE WRITTEN CONSENT OF GIBF GP, Inc.

- The Purchaser acknowledges and understands that the SAFT is not registered with the Securities and Exchange Commission, and that the Company is not registered or licensed with any federal or state regulator as an investment adviser, broker-dealer, money services business, money transmitter, or virtual currency business.

- The SAFT will not be registered under the Securities Act, and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements. This means that holders of the SAFT may not transfer the SAFT to any "U.S. Person," within the meaning of Rule 902(a)(k) under the Securities Act; provided that holders of the SAFT may transfer the SAFT to U.S. Persons that are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and in compliance with applicable U.S. securities laws.

33.    In addition, Basile personally told at least one investor that the SAFT was a "securities contract" and that the purchase of the SAFT was a "securities transaction."

## B.    Basile Marketed the SAFTs to Investors.

34.    During the Relevant Period, Basile commissioned and distributed marketing materials as part of the SAFT Offering.

35.    Basile also retained, and arranged for GIBF and Monsoon to retain, consultants and marketing companies, and directed their efforts to promote LTNM and the sale of SAFTs.

36.    During the Relevant Period, in addition to directing GIBF's and Monsoon's marketing efforts, Basile personally sold SAFTs to various individual investors.

37.    As Monsoon's CEO, Basile caused a Letter Agreement to be created among Monsoon, GIBF, and another entity, called GIBF GP (Cayman), Ltd. (the "Letter Agreement"), which purported to be effective October 1, 2020.

38.    GIBF GP (Cayman), Ltd. was a wholly owned subsidiary of GIBF.

39.    The Letter Agreement recited that GIBF "intend[ed] to make an offering of" Bitcoin Latinum tokens via the SAFT Offering.

40.    The Letter Agreement specified, among other things, that Monsoon would "develop and provide a Whitepaper" and other materials to support the SAFT Offering; "develop and operate a website for the Bitcoin Latinum project"; and "engage such consultants and other parties to support the marketing of the SAFT Offering and the overall awareness of the Bitcoin Latinum project."

41.    Although Basile at various times used terms such as network, project, and foundation interchangeably while promoting the SAFT Offering, in fact Basile exercised control over all aspects of the SAFT Offering and LTNM during the Relevant Period, and no separate

network, project, or foundation existed beyond what Basile himself directed, oversaw, and controlled.

42.     The Letter Agreement also stated "GIBF will disburse the first $50 million of SAFT Offering proceeds at the direction of Monsoon" in satisfaction of fees supposedly owed to Monsoon, although the Letter Agreement further specified that GIBF may first deduct its expenses from the SAFT Offering and a $100,000 monthly fee.

43.     Although, as described in paragraphs 150-70 below, Basile falsely told investors that 80% or more of all SAFT Offering proceeds would be used to support the value of LTNM, Basile did not disclose to SAFT Offering investors the existence or terms of the Letter Agreement or the fee arrangement described in paragraph 42 above.

44.     In 2020, at Basile's direction, consultants created a pitch deck presentation about Bitcoin Latinum to be given to investors (the "Pitch Deck").

45.     The Pitch Deck described Bitcoin Latinum as "a new Bitcoin interchange token for media, gaming, cloud and telecommunications digital transactions," and claimed, among other things, that Bitcoin Latinum "supports transactions times in second to tens of second to facilitate retail transactions," and "looks to reduce the cost of a Bitcoin transaction from dollars to pennies."

46.     Basile approved the contents of the Pitch Deck and personally sent the Pitch Deck to prospective investors.

47.     In or around April 2021, Basile signed an agreement on behalf of Monsoon with a marketing company ("Marketing Company 1") with a stated goal of "increas[ing] investor awareness of LTNM's practical utility and enhanced security features."

48.     In or around April 2021, Basile sent the Pitch Deck to Marketing Company 1 for its use in a public relations and social media campaign promoting the SAFT Offering.

49. Using the Pitch Deck, Marketing Company 1 then created a document called "An Investor Overview from [Marketing Company 1]" (the "Investor Overview"), which was designed to be given to investors.

50. The public relations and social media campaign included the use of Twitter (also known as X.com), Facebook, LinkedIn, Telegram, Instagram, Medium, Discord, and YouTube.

51. In 2020, Basile hired consultants to draft a "Bitcoin Latinum White Paper" ("the Whitepaper"), based on information that Basile provided.

52. Basile approved the contents of the Whitepaper and, in or around June 2021, its placement on the Bitcoin Latinum public website.

53. In or around August 2021, an updated version of the Whitepaper was made public on the Bitcoin Latinum website.

54. Basile emailed the Whitepaper to prospective investors and approved its use by third party marketing companies in the public relations and social media campaign promoting the SAFT Offering.

55. The Whitepaper was expressly incorporated into the SAFT Purchase Agreements, which stated that Investors agreed to be bound by, among other things, "any other offering materials provided to you with respect to the Tokens, including, but not limited to, the whitepaper describing the Tokens and the whitepaper describing the network through the date of your execution of this Purchase Agreement."

56. Both the June and August 2021 versions of the Whitepaper identified GIBF as "the Company" that provided the Whitepaper to recipients.

57. Both the June and August 2021 versions of the Whitepaper also stated that Monsoon was the "prime developer of the Bitcoin Latinum Network on behalf of the Bitcoin Latinum Foundation."

58.     Both the June and August 2021 versions of the Whitepaper repeatedly contrasted LTNM with earlier and better-known crypto assets, such as Bitcoin, and further claimed that LTNM was "capable of massive transaction volume, digital asset management, cybersecurity, and transaction capacity."

59.     During the Relevant Period, Basile caused the Whitepaper, Investor Overview, and other promotional material to be disseminated to investors, including through the Bitcoin Latinum website.

60.     Basile also personally emailed the Whitepaper, Investor Overview, and other promotional materials directly to prospective investors.

61.     In or around July 2021, Basile signed an agreement on behalf of GIBF with a second third-party marketing firm ("Marketing Company 2") to conduct "social media management" and "guerilla marketing on Twitter."

62.     By the time Basile arranged for GIBF to hire Marketing Company 2, the Whitepaper and Investor Overview were publicly available on the Bitcoin Latinum website, and Marketing Company 2 used those documents to craft its marketing campaign.

63.     In or around October 2021, Basile further approved GIBF's paying Marketing Company 2 for a social media and marketing campaign that Marketing Company 2 called "Mega-Shilling" in support of the SAFT Offering.

64.     In addition, during the Relevant Period, Basile regularly approved promotional press releases—purportedly issued by "Bitcoin Latinum"—and caused them to be posted on the Bitcoin Latinum website and disseminated to investors through newswire services.

65.     For example, Basile approved a September 27, 2021 press release (the "September 27 Release") that listed him as "Monsoon Blockchain Corporation's CEO and Founder."

66. Basile also personally promoted the SAFT Offering through speaking engagements and appearances on podcasts and in YouTube videos.

## C. Defendants' Operations and Marketing of the SAFTs and the SAFT Terms Themselves Rendered the SAFTs Securities.

67. Throughout the Relevant Period, Basile marketed the SAFTs as profitable investments in which investors would receive a return on investment through the appreciation of LTNM, which was linked to Defendants' own expected profits and which was based on Defendants' entrepreneurial and managerial efforts to develop and manage the LTNM enterprise.

68. During the Relevant Period, investors tendered U.S. dollars and crypto assets to Defendants to purchase SAFTs.

69. In some instances, SAFT Offering investors tendered U.S. dollars or crypto assets to Basile, and Basile accepted those funds or crypto assets without executing a SAFT with the investor.

70. Each SAFT Offering investor's fortunes were tied to the fortunes of other investors, as well as to the success of Basile's overall LTNM enterprise.

71. For example, Basile pooled the U.S. dollars and crypto assets that he received from SAFT Offering investors into bank accounts and crypto asset wallets under his control.

72. These bank accounts and crypto asset wallets included accounts and wallets in the name of GIBF.

73. In addition, as discussed further herein, Basile represented, and disseminated representations, that 80% of SAFT Offering proceeds would be "used to support the underlying value of" LTNM and would "flow back to LNTM [sic] to support token development."

74. These representations were false. In fact, nothing approaching 80% of SAFT Offering proceeds was used to support LTNM development, and throughout the Relevant Period, Basile used funds and crypto assets received from SAFT Offering investors for his own benefit.

75. In addition, the ability of each SAFT Offering investor to profit was entirely dependent on the declaration of the Milestone by GIBF and the distribution of LTNM to investors.

76. If these events did not occur, then all SAFT Offering investors would be equally affected and would lose their opportunity to profit from LTNM.

77. Furthermore, each SAFT Offering investor's fortunes were linked to the fortunes of Defendants.

78. Specifically, as set forth in the SAFTs, GIBF owned the LTNM tokens.

79. Further, during the Relevant Period, GIBF had no operations other than in connection with the SAFT Offering.

80. Under the Letter Agreement, which Defendants did not disclose to SAFT Offering investors, Monsoon purportedly had a contractual right to receive "the first fifty million dollars of SAFT Offering proceeds" from GIBF, less GIBF's expenses and a monthly fee of $100,000.

81. Furthermore, during the Relevant Period, Monsoon had no operations other than in connection with the SAFT Offering.

82. Basile was the controlling shareholder of Monsoon and GIBF and an officer of both companies.

83. As set forth in the SAFTs, investors expected to receive LTNM in an amount proportional to their SAFT investment if and when GIBF declared the Milestone.

84. Thus, SAFT Offering investors could only receive a return on their SAFT investments through appreciation in the value of LTNM, and any such return would be proportionate to the amount they had invested in the SAFTs.

85. Basile's SAFT and marketing materials made clear to investors that any return on their investment in the SAFTs would derive from Defendants' entrepreneurial and managerial efforts to increase the value of LTNM.

86. For example, the SAFTs specified that GIBF was solely responsible for declaring the Milestone event, which was the only way for investors to receive LTNM, and stated that delivery would take place "[u]pon the satisfaction of the Milestone by [GIBF]."

87. In addition, the September 27 Release was entitled "Monsoon Blockchain Powers the Next Generation Cryptocurrency Ecosystem for Bitcoin Latinum," listed Basile as Monsoon's "CEO and founder," and described the efforts Monsoon would undertake to "further the mass adoption of Bitcoin Latinum."

88. Among other things, the September 27 Release stated that Monsoon was the "first adopter" of LTNM; "will utilize Bitcoin Latinum in developing powerful blockchain technologies and business solutions, in addition to digitizing and listing assets for companies and organizations across the globe"; and "is facilitating the launch of Bitcoin Latinum on public exchanges in 2021."

89. The September 27 Release further claimed that LTNM's value would go up the more people used it:

> Its asset-backing is held in a fund model, *so the base asset value increases over time*. It accelerates this asset-backed fund growth by depositing 80% of the transaction fee back into the asset fund that backs the currency. *Thus, the more Bitcoin Latinum is adopted the faster its asset funds grow, creating a self-inflating currency.* (emphasis added)

90. Similar to the September 27 Release, the Investor Overview contained a "Roadmap & Growth Strategy" and itemized the specific actions the Bitcoin Latinum project would undertake, including: "Expand network partnerships"; "Greater adoption by core market participants"; Expanded network of approved validators"; and "Consumer level offerings."

91. Likewise, the Whitepaper contained a "Roadmap" for future Bitcoin Latinum project actions.

92. The June 2021 version of the Whitepaper Roadmap asserted that the following actions, among others, were "In Progress:" "Protocol enhancements," "Listing on Coinmarketcap," and "Test net deployment."

93.    The August 2021 version of the Whitepaper Roadmap asserted that the "Protocol enhancements" and "Listing on Coinmarketcap" had been "completed," and described other actions as "In Progress," including (among others), "Test net deployment," "Integration with Crypto exchanges," and "Alliance with Media Studios."

94.    The August 2021 version of the Whitepaper Roadmap further asserted that additional project actions would occur in the future, including, among others, "Expand to more global exchanges," "Adoption by Core market participants," "Major alliances with Cloud and Storage Partners," "Expansion of approved parties to increase decentralization," and "Consumer level partner offerings."

95.    In addition, Basile approved a series of press releases describing work that Monsoon and Basile were purportedly doing to further the Bitcoin Latinum project.

96.    For example, Basile approved an August 11, 2021 press release (the "August 11 Release"), announcing a partnership between Bitcoin Latinum and a luxury hospitality and lifestyle company, through which the company would purportedly accept LTNM as payment for goods and services.

97.    The August 11 Release described Basile as the CEO and founder of Monsoon and included a quote from Basile stating "[w]e look forward to our partnership."

98.    In addition, the Pitch Deck began by describing LTNM's potential to grow in value, including as "[a] new Bitcoin interchange token for media, gaming, cloud and telecommunications digital transactions."

99.    The Pitch Deck went on to list future market opportunities, described as "Market Drivers," for LTNM, including the "$100 B[illion]" movie industry; "$200 B[illion]" gaming industry; "$800 B[illion]" "Cloud computing market"; and "$5 Trillion" "Security" market. In other

words, in the Pitch Deck, Basile was telling investors that LTNM would be adopted in each of these markets, causing its value to rise because more people would want to use it.

100.    Similarly, both the June and August 2021 versions of the Whitepaper listed four "Target Markets" for Bitcoin Latinum and claimed that Bitcoin Latinum "disrupts high growth industries such as Media, Cloud Computing, Gaming and Telecommunications," with purported market sizes ranging from $1.6 trillion for telecommunications to $100 billion each for media and cloud computing.

101.    In addition, Basile made public statements and caused SAFT Offering marketing documents to state that investors in the SAFT Offering could make money through LTNM increasing in value.

102.    For example, in an August 19, 2021 interview that was later posted on the Bitcoin Latinum website, Basile stated "of course we are coming out at twenty dollars on exchanges so if you missed your twenty dollar via bitcoin maybe you want to buy your twenty dollar Bitcoin Latinum."

## II.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AS PART OF THE SAFT OFFERING

103.    During the Relevant Period, Basile repeatedly made materially false and misleading statements to investors in the SAFT Offering regarding LTNM—claiming that it was "insured" and "asset-backed" when it was not; and that "80%" or more of the SAFT Offering proceeds "just goes into an underlying fund," when no such fund existed, and Basile spent far in excess of 20% of SAFT Offering proceeds for his personal benefit.

104.    As described in paragraphs 110-73 below, Basile made these false and misleading statements directly to individual investors; in public statements; and in various documents that he approved, over which he held ultimate authority, and that he personally distributed to investors.

105.    Basile's false and misleading statements were designed to mislead investors about

16

their SAFT investments by claiming that the LTNM they would receive was insured against loss or theft and backed by assets and, thus, less likely to lose value.

106. Defendants used these misstatements as important selling points to distinguish LTNM from other crypto assets like Bitcoin.

107. Basile repeated and amplified his false claims, including through GIBF and Monsoon, in an effort to entice investors to purchase SAFTs, and thereby, the right to obtain LTNM in the future.

108. The misrepresentations Defendants made to investors, detailed in paragraphs 110-173, were material to investors in the SAFT Offering because, among other things, they misstated the security, value, and ability to maintain value of LTNM, all of which were (and objectively would be) important metrics to someone considering whether to invest in the SAFT Offering.

109. Defendants obtained money and property from SAFT Offering investors by means of the untrue statements of material fact described herein.

### A. Defendants Falsely Claimed that LTNM Was Insured.

110. During the Relevant Period, Basile repeatedly made false and misleading public statements claiming that LTNM was insured or was the world's first insured crypto asset, often specifically referencing Insurance Broker 1 by name.

111. For example, in the September 27 Release that Basile approved, that listed Basile as "Monsoon Blockchain Corporation's CEO and Founder," and that was publicly attributed to Monsoon, Basile and Monsoon stated that "Bitcoin Latinum is an insured, asset-backed cryptocurrency."

112. In the September 27 Release, Basile and Monsoon further stated, under a heading describing LTNM as "Insured," that "Bitcoin Latinum is an asset-backed cryptocurrency, and is working to be the world's largest insured digital asset."

113.    Likewise, the Pitch Deck stated that LTNM "is the world's first insured digital asset, up to $1 Billion USD."

114.    Similarly, in both the June and August 2021 versions of the Whitepaper, Basile and GIBF stated that LTNM was "Secure and Insured" and that "users are protected under a comprehensive insurance program that protects LTNM holders in case of internal collusion or external theft."

115.    Both the June and the August 2021 versions of the Whitepaper further stated that LTNM "is also the world's first insured digital asset, with up to USD 1 billion coverage from a leading specialty insurance broker and risk adviser, [Insurance Broker 1]."

116.    During the Relevant Period, Basile personally made multiple public statements in media appearances and interviews falsely stating that LTNM, Bitcoin Latinum, or the assets purportedly backing LTNM were insured.

117.    For example, in or around August 2021, in a publicly available interview where Basile was introduced as "the founder of Bitcoin Latinum," Basile stated that LTNM had a trust fund underlying it and that "it's that portfolio wrapped in cyber risk, cyber theft insurance that's there to go ahead and actually support the underlying currency's value."

118.    Basile's August 2021 interview was later promoted by the @BitcoinLatinum Twitter account and publicly posted on the Bitcoin Latinum website under the headline "Monsoon Blockchain Corporation CEO Dr. Don Basile discusses Bitcoin Latinum, the world's first insured digital currency backed by [Insurance Broker 1]."

119.    On or around August 16, 2021, Basile stated in an interview—later publicly promoted on the @BitcoinLatinum Twitter account and posted on the Bitcoin Latinum website— that "the idea of taking that asset-backing and wrap it into an insurance for cyber theft or cyber loss was important to [Bitcoin Latinum's] partners."

120. On or around August 19, 2021, Basile stated in an interview, later posted to the Bitcoin Latinum website, that "we built Latinum based upon the idea of an underlying trust fund" and that this "asset pool wraps in insurance, arrange[d] by [Insurance Broker 1], the world's largest insurance broker."

121. On or around August 22, 2021, Basile stated in an interview, later posted to the Bitcoin Latinum website, that Bitcoin Latinum had "insurance, which today covers the asset backing of the trust fund...."

122. During the Relevant Period, Basile also made multiple false and misleading statements directly to investors that LTNM and the assets purportedly backing it were insured.

123. For example, in or around May 2021, Basile told Investor A, who had not yet invested in the SAFT Offering, that the Bitcoin Latinum "fund structure" was insured by Insurance Broker 1.

124. Specifically, Basile stated in a call with Investor A, "That's the part that [Insurance Broker 1] is insuring, which is to, to insure that asset base against cyber theft, cyber loss, or internal, you know, malfeasance that's occurred in these other exchanges."

125. Later, Investor A emailed Basile for further information about the insurance, and Basile wrote that Insurance Broker 1 "is arranging a policy for cyber theft and loss around the Foundation trust fund assets."

126. Based in part on Basile's statements about insurance, Investor A made a $275,000 investment in the SAFT Offering.

127. Likewise, in or around October 2021, in a call with Investors B and C, one of whom lived in New York State, Basile stated that LTNM tokens were insured against cyber theft.

128. After the call with Basile and based on his representations, including about insurance, Investors B and C both invested in the SAFT Offering.

129.    Defendants' repeated statements that Bitcoin Latinum was "insured" were materially false and misleading.

130.    By stating that LTNM was "insured," Basile intentionally sought to create the false impression that the SAFT Offering was a safer and more attractive investment than other crypto asset-related investments because it was less likely to lose value due to the purported insurance.

131.    In reality, when Basile made the statements contained in paragraphs 110-30, above, when GIBF made the statements contained in paragraphs 114-15 above, and when Monsoon made the statements contained in paragraphs 111-12 above, those statements were false because no insurance contract, agreement, or coverage of any kind existed to cover LTNM or anything related to LTNM or the SAFT Offering.

132.    In fact, while Basile had been in contact with Insurance Broker 1 during the Relevant Period, neither Insurance Broker 1 nor any insurance company had ever issued any coverage for LTNM or anything related to LTNM or the SAFT Offering.

133.    Despite their numerous statements that LTNM was "insured," at no point did any of the Defendants ever obtain any insurance coverage for LTNM or anything related to LTNM or the SAFT Offering from Insurance Broker 1 or anyone else.

134.    At the time Defendants made the false statements referenced in paragraph 131 above, they knew or recklessly disregarded that those statements were false because Basile, who had personally handled discussions with Insurance Broker 1, knew that no insurance coverage for anything related to LTNM or the SAFT Offering had ever been obtained.

**B.    Basile and Monsoon Made False and Misleading Statements that LTNM Was Asset-Backed.**

135.    During the Relevant Period, Basile repeatedly made materially false and misleading statements that described LTNM as "asset-backed."

136.    For example, in the September 27 Release, Basile and Monsoon stated that "Bitcoin Latinum is an insured, asset-backed cryptocurrency."

137.    In the September 27 Release, Basile and Monsoon went on to state, "[u]nlike other existing cryptocurrencies, Bitcoin Latinum is an asset-backed cryptocurrency, and is working to be the world's largest insured digital asset. Its asset-backing is held in a fund model, so the base asset value increases over time."

138.    Likewise, the Pitch Deck stated under the "Invest" heading that "[a] basket of crypto-tokens and other digital assets is managed to support the appreciation of the underlying asset pool."

139.    During the Relevant Period, Basile personally made multiple public statements in media appearances and in interviews that LTNM was asset-backed.

140.    For example, in an August 2021 recorded interview—which was publicly available, promoted by the @BitcoinLatinum Twitter account, and posted on the Bitcoin Latinum website— Basile stated that:

> The first thing you want in insurance world is an asset you can actually back. So in the case of Latinum, a trust fund underlies it, like a university trust, with a diversified set of holdings in equity, in real estate, in other cryptocurrencies and other products you'd expect to have in a diversified portfolio. So it's that portfolio ... that's there to go ahead and actually support the underlying currency's value.

141.    On or around August 16, 2021, in a recorded interview that was later publicly promoted on the @BitcoinLatinum Twitter account, Basile stated that LTNM "is an asset-backed cryptocurrency."

142.    On or around August 19, 2021, in a podcast interview that was later posted on the Bitcoin Latinum website, Basile stated that Monsoon had "built the Latinum network" and done so "in such a way that corporations could be very comfortable with it as an asset backed security...."

143. In the August 19, 2021 podcast interview, Basile further stated, "we built Latinum based upon the idea of an underlying trust fund."

144. Furthermore, when asked in the August 19, 2021 podcast interview to distinguish LTNM from other crypto assets, Basile stated in the podcast audio:

> So, low low cost, okay? Low cost of your transaction fee. High speed, so you know your bitcoin transaction could take 48 hours to settle, okay? *Asset backed, so there's an underlying asset pool behind the currency, okay?* And that asset pool increases every time you actually do a transaction, eighty percent of that low network fee goes into the asset pool, so that asset pool is always increasing over time. Additionally, the asset pool is wrapped in insurance, arranged by [Insurance Broker 1], the world's largest insurance broker. [emphasis added]

145. In or around August 22, 2021, in a podcast interview that was later posted on the Bitcoin Latinum website, Basile stated about Bitcoin Latinum: "it's backed by an underlying pool of assets. So it has an underlying asset back to it."

146. On or around September 8, 2021, in a YouTube channel appearance that was later posted on the Bitcoin Latinum website, Basile stated about Bitcoin Latinum:

> Because that is an asset-backed model, that is, there's an existing trust—that trust is added to—that provide a floor on the currency versus essentially almost every other currency out there...the currency has no backstop to it. And this is very important for our corporate partners that want to adopt it because they know there's a value greater than zero for the goods and services they sell. ... But there always is a backstop and that backstop is growing over time.

147. During the Relevant Period, Basile also made multiple false and misleading statements directly to investors that LTNM were asset-backed.

148. For example, in or around May 2021, Basile told Investor A, who had not yet invested in the SAFT Offering, in a recorded call that there was "an underlying fund. … [I]t's basically like an ETF fund. *So BTC is in there now, ETH is in there now.* If you take some other digital asset or representation, it's just held in a fund structure underlying the value…." (emphasis added)

149. Defendants' repeated statements that "Bitcoin Latinum is an asset-backed cryptocurrency" and that LTNM was "asset-backed" were materially false and misleading.

150. By stating that LTNM was "asset-backed," Basile intentionally created the false impression that the SAFT Offering was a safer investment than other crypto asset-related investments because LTNM tokens were secured by a portfolio of real-world assets.

151. In reality, when Basile made the statements contained in paragraphs 135-50, above, and when Monsoon made the statements contained in paragraphs 136-37 above, LTNM was not asset-backed, and no "trust," "fund," or "pool" existed to "support" the value of LTNM.

152. Basile and Monsoon knew or recklessly disregarded the falsity of their statements that LTNM "is an asset-backed" crypto asset because they never caused LTNM to be backed by any assets, and they never set aside or otherwise placed in a "trust," "fund," or "pool" any assets for the use or benefit of SAFT Offering investors.

**C.      Basile Made False and Misleading Statements that 80% or More of the SAFT Offering Proceeds Were Being Used to Support LTNM's Underlying Value.**

153. During the Relevant Period, Basile made false and misleading statements that 80% or more of the SAFT Offering proceeds were being placed in a "fund" and were being used to support the underlying value of LTNM.

154. For example, the Pitch Deck that Basile approved stated that "80% of initial token pre-launch and launch sales … are used to support the underlying value of the Bitcoin Latinum token."

155. During the Relevant Period, Basile also made false and misleading statements directly to investors about the use of SAFT Offering proceeds.

156. For example, in or around May 2021, Basile told Investor A, who had not yet invested in the SAFT Offering, in a recorded call that "90 plus percent of any pre-sale amount or any amount sold by the foundation just goes into an underlying fund…."

157.    Basile's repeated statements that 80% or more of the SAFT Offering proceeds were being used to support the underlying value of LTNM were materially false and misleading.

158.    By stating that an overwhelming proportion of sale proceeds were being used to support LTNM, Basile intentionally created the false impression that the SAFT Offering was a safer investment than other crypto asset-related investments because SAFT Offering proceeds were being deposited in a "fund" and were being used to "support the underlying value" of LTNM.

159.    In reality, when Basile made the statements contained in paragraphs 153-58,  he knew or recklessly disregarded that these statements were false because he knew that nothing approaching 80% of the SAFT Offering proceeds were being used, or would be used, to support LTNM's value or to provide an "underlying fund."

160.    Indeed, SAFT Offering investor funds were not placed in an "underlying fund" and were not used as "underlying value" to support LTNM.

161.    Instead, as set forth below, Basile spent SAFT Offering proceeds on Basile's personal expenses, including real estate, credit card bills, and a horse for his daughter.

162.    The percentage of SAFT Offering proceeds that Basile spent on personal expenses far exceeded 20% of the total SAFT Offering proceeds.

163.    Moreover, to the extent that investor funds were used not for Basile's personal expenses, such funds were generally spent on marketing and other expenses and, thus, were not available to "support" LTNM's value, let alone to be stored in a "fund."

164.    Throughout the Relevant Period, Basile directed that most SAFT Offering proceeds be sent to bank and crypto asset trading platform accounts held in the names of GIBF or other entities under his control.

165.    The SAFT Offering proceeds that GIBF and other entities controlled by Basile received from investors during the Relevant Period totaled approximately $16 million.

166. At various times during the Relevant Period and afterwards, Basile commingled investor funds with other monies and crypto assets, and then either spent them, or distributed them to other entities or bank accounts that he controlled.

167. Despite Basile telling investors that 80% or more of SAFT Offering proceeds would be used to support LTNM and disseminating the Investor Overview that included a similar misrepresentation, Basile used SAFT Offering proceeds to benefit himself personally or to benefit his family.

168. For example, Basile used accounts holding investor funds to pay approximately $4.1 million towards the purchase of a condominium in Miami, Florida.

169. Basile also used accounts holding investor funds to buy a $2.8 million house in Park City, Utah.

170. Both the Miami condominium and Park City house were titled under Basile family entities.

171. Basile also used accounts holding investor funds to pay about $1.4 million on Basile's personal American Express card and to fund about $1 million in transfers to bank accounts under his control or that of his family.

172. Basile further used accounts holding investor funds to buy a $160,000 horse for his daughter.

173. These payments were made for Basile's personal benefit and were not business expenses or fees.

*    *    *

174. Despite Defendants obtaining and then misappropriating millions of dollars in investor funds for their benefit, they never carried out their stated "Roadmap" from the June and August 2021 versions of the Whitepaper. Namely, Defendants failed to secure "Adoption by Core

25

market participants," failed to achieve "Major Alliances with Cloud and Storage Partners," and failed to issue "Consumer level partner offerings."

175. Instead, beginning in or around October 2021, Basile arranged for GIBF to pay for LTNM to be listed on certain overseas crypto asset trading platforms.

176. Thus, by in or around October 2021, LTNM was being traded on overseas exchanges, but GIBF (which Basile controlled) did not declare that a Milestone had been satisfied, which the SAFT stated would occur when "the newly forked Bitcoin Network is operational after a successful Hard Fork with Token functionality as determined by [GIBF] in its sole discretion."

177. Moreover, in or around October 2021, GIBF did not distribute LTNM to SAFT Offering investors.

178. In November 2021, Basile authorized GIBF to send a survey to SAFT Offering investors proposing to delay distribution of LTNM until February 2022, when LTNM would supposedly be available on more crypto asset trading platforms, which Defendants claimed would "generate more volume and stability and will have a positive impact on the price."

179. By the end of January 2022, the prices being quoted for LTNM on overseas crypto asset trading platforms had fallen substantially, from the equivalent of approximately $200 in October 2021 to less than approximately $16.

180. In February 2022, two SAFT Offering investors filed suit in the U.S. District Court for the Eastern District of Michigan alleging, among other things, securities fraud related to the SAFT Offering; that lawsuit is presently still pending.

181. Shortly after the filing of that lawsuit, at Basile's direction, GIBF communicated to SAFT Offering investors that GIBF was not declaring the Milestone, and (among other things) that "overall conditions are challenging."

182. Thereafter, Defendants stopped their efforts to promote LTNM.

183.    In February 2023, at Basile's direction, GIBF communicated to SAFT Offering investors that they could either accept LTNM delivery or wait until the resolution of pending litigation to receive a refund; GIBF cautioned that funds might not be available from which to pay refunds.

184.    LTNM is presently valueless.

185.    Because of LTNM's lack of value, and Defendants' failure to issue refunds, many SAFT Offering investors have suffered the loss of their entire investments.

## III.    BASILE SCHEMED TO DEFRAUD INVESTORS BY DISSEMINATING FALSE INFORMATION, INCLUDING THROUGH THIRD PARTIES

186.    In addition to making the false statements described above, Basile schemed to defraud SAFT Offering investors by arranging for and using a web of marketing entities and social media accounts to disseminate false and misleading information to investors and by using investor funds to enrich himself personally.

187.    Basile used multiple entities and accounts to disseminate false information.

188.    Basile signed the engagement letters for Marketing Company 1 and Marketing Company 2, under which they prepared documents, press releases, and social media campaigns, using information that Defendants provided.

189.    In or around April 2021, Basile hired Marketing Company 1, provided it with the Pitch Deck that contained false and misleading statements, and charged it with developing more marketing materials with a goal of "increas[ing] investor awareness of LTNM's practical utility and enhanced security features."

190.    Marketing Company 1 in turn created the Investor Overview, which described itself as "An Investor Overview from [Marketing Company 1]."

27

191.    In reality, Basile was the source of the information about LTNM in the Investor Overview, and the Investor Overview largely repeated the false statements that Basile had provided, but this time under Marketing Company 1's name.

192.    For example, the Investor Overview falsely stated that "80% of token pre-launch sales and 80% of network fees will flow back into LNTM [sic] to support token development"; and that "[a] basket of digital assets such as Bitcoin and Ethereum are managed to support the LTNM asset pool."

193.    The Investor Overview further falsely stated that "Latinum is the world's first insured digital asset: up to $1 Billion USD."

194.    Basile disseminated the Investor Overview directly to prospective investors and authorized its placement on the Bitcoin Latinum website.

195.    Pursuant to the engagement letter that Basile had signed on or about May 1, 2021, Marketing Company 1 also began a campaign on "major social media platforms," which amplified and further disseminated the false statements that Basile had transmitted to Marketing Company 1.

196.    For example, on or around June 17, 2021, using information Basile had caused to be given to Marketing Company 1, the @BitcoinLatinum Twitter account tweeted: "Our edge?  Bitcoin Latinum is the world's first insured #cryptocurrency.  Learn how your coins are protected up to $1 billion USD."  This tweet ended with a hyperlink to a Bitcoin Latinum press release that included similar false statements.

197.    In or around July 2021, Basile signed an engagement letter with Marketing Company 2, which contemplated providing Marketing Company 2 with all "non-sensitive information, branding, testimonials and other business materials as needed to achieve maximum results for the Client."

198.    Marketing Company 2 relied on the Whitepaper and other information that Basile had approved to generate social media postings and press releases.

199.    In addition, in or around October 2021, Basile authorized GIBF to hire and pay Marketing Company 2 for "Mega-Shilling," a marketing package for social media accounts.

200.    The "Mega-Shilling" package included "500-700 original posts/conversations daily" on Telegram and Twitter.

201.    In October 2021, based on information Basile caused to be provided to Market Company 2, the @BitcoinLatinum Twitter account tweeted an announcement that LTNM, "the next-generation, insured, asset-backed #crypto, will be listed on @DigiFinex … in the third week of October."

202.    In November 2021, based on information Basile caused to be provided to Market Company 2, the @BitcoinLatinum Twitter account tweeted three "reasons why your business needs to onboard $LTNM," the third reason being that LTNM is "Insured and backed by real-world and digital assets."

203.    In addition, many of the press releases Basile caused to be issued and disseminated as purported statements from "Bitcoin Latinum" also contained the false statements discussed above.

204.    Finally, in furtherance of his scheme, as described in paragraphs 153-73, despite telling SAFT Offering investors that 80% or more of the SAFT Offering proceeds would go into a fund or otherwise support the value of LTNM, Basile personally spent far in excess of 20% of SAFT Offering proceeds on his own personal enrichment.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Basile)

205.    The Commission re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 204.

206.    Basile, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

207.    By reason of the foregoing, Basile, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Basile)**

208.    The Commission re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 204.

209.    Basile, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

210.    By reason of the foregoing, Basile, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder
### (GIBF and Monsoon)

211.    The Commission re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 152 and 160-85.

212.    GIBF and Monsoon, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

213.    By reason of the foregoing, GIBF and Monsoon, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2)
### (GIBF and Monsoon)

214.    The Commission re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 152 and 160-85.

215.    GIBF and Monsoon, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material

fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

216.   By reason of the foregoing, Defendants GIBF and Monsoon, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Basile)

217.   The Commission re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 204.

218.   For the reasons set forth in paragraphs 1 through 152 and 160-85, GIBF and Monsoon knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219.   For the reasons set forth above in paragraphs 1 through 152 and 160-85, GIBF and Monsoon violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2).

220.   By engaging in the acts and conduct described in in paragraphs 1 through 204, Basile knowingly or recklessly provided substantial assistance to GIBF and Monsoon with respect to their violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

221.   By reason of the foregoing, Basile is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting GIBF's and Monsoon's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Basile will again aid and abet these violations.

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and**
**Rule 10b-5(b) Thereunder**
**(Basile)**

222.    The Commission re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 204.

223.    For the reasons set forth in paragraphs 1 through 152 and 160-85, GIBF and Monsoon directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

224.    For the reasons set forth above in paragraphs 1 through 152 and 160-85, GIBF and Monsoon violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

225.    By engaging in the acts and conduct described in paragraphs 1 through 204, Basile knowingly or recklessly provided substantial assistance to GIBF and Monsoon with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

226.    By reason of the foregoing, Basile is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting GIBF's and Monsoon's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] and, unless enjoined, Basile will again aid and abet these violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final

Judgment:

**I.**

Permanently enjoining Defendants Basile, GIBF, and Monsoon and their agents, servants,

employees and attorneys and all persons in active concert or participation with any of them from

violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Permanently restraining and enjoining Defendants Basile, GIBF, and Monsoon from,

directly or indirectly, including, but not limited to, through any entity owned or controlled by them,

participating in the issuance, purchase, offer, or sale of any security, provided, however, that such

injunction shall not prevent Basile from purchasing or selling securities for his own personal

account, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Sections

21(d)(1) and 21(d)(5) [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)];

**III.**

Ordering Defendants Basile, GIBF, and Monsoon to disgorge all ill-gotten gains they

received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged

violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C.

§§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**IV.**

Ordering Defendants Basile, GIBF, and Monsoon to pay civil monetary penalties under

Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C.

§ 78u(d)(3)];

**V.**

Permanently prohibiting Defendant Basile from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**VI.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated:  New York, New York
        April 17, 2026

                                    _____/s/ Nicholas Flath_____
                                    Sheldon Pollock
                                    Wendy Tepperman
                                    Hayden M. Brockett*
                                    Nicholas Flath
                                    Teresa A. Rodriguez
                                    *Pro hac vice application forthcoming

                                    U.S. SECURITIES AND EXCHANGE
                                    COMMISSION
                                    New York Regional Office
                                    100 Pearl Street
                                    Suite 20-100
                                    New York, NY 10004-2616
                                    (212) 336-9107 (Brockett)
                                    BrockettH@sec.gov
                                    *Attorneys for Plaintiff*

35